# SARAH L. ORCUTT v. J. NEILS LUMBER COMPANY.[1]

May 19, 1911.

Nos. 16,911—(40).

**Assumption of risk — promise to correct defect.**

The chains which held the logs to the cars in shipment were fastened by fid hooks, and when the shanks were down could be snapped out with safety. When the shanks were up, the usual method was to strike the hook out with a peavy. *Held:*

1. The evidence sustains plaintiff's claim that defendant promised decedent to have the hooks adjusted with the shanks down, and that he continued to work, unloading in the customary manner, in reliance on the promise.

[1] Reported in 131 N. W. 464.

---

[Note] Rights of servant continuing work on master's promise to remove a specific cause of danger, see notes in 40 L.R.A. 782; 4 L.R.A.(N.S.) 971; 22 L.R.A.(N.S.) 472; 27 L.R.A.(N.S.) 1052; 29 L.R.A.(N.S.) 598.

2. The promise was not indefinite, and the danger of using a peavy was not so obvious that deceased must be held to have assumed the risk.

3. It does not conclusively appear that he was guilty of contributory negligence.

Action in the district court for Benton county by the administratrix of the estate of Daniel Orcutt, deceased, to recover $5,000 for the death of her intestate. The answer denied that on July 15, 1909, or at any other time, Daniel Orcutt complained to defendant in respect to the method of adjustment of the grab hooks and chains, or that defendant promised to adjust the hooks differently. The answer alleged that decedent's death was caused by his own carelessness or was due to a risk incident to the work in which he was engaged; that the risks connected with his work were open, apparent, understood and appreciated by deceased. The reply was a general denial. The case was tried before Taylor, J., who, at the close of the trial, denied defendant's motion for a directed verdict. The jury returned a verdict in favor of plaintiff for $2,500. From the judgment entered pursuant to the verdict, defendant appealed. Affirmed.

*Stewart & Brower,* for appellant.

*M. H. Boutelle* and *A. M. Higgins,* for respondent.

LEWIS, J.

On August 7, 1909, plaintiff's intestate, Daniel Orcutt, was killed by logs which fell from a car he was unloading. Plaintiff recovered a verdict, and defendant appealed from the judgment.

The logs were piled in tiers on flat cars, and were shipped from the vicinity of Cass Lake to Sauk Rapids, where the accident occurred. They were held in place by chains fastened with fid hooks. When the hooks were adjusted with the shanks down, they could be released by a snap chain about twenty-two feet long fastened in a ring at the upper end. A man could stand away a safe distance and snap the hooks out. The charge of negligence was that the hooks were placed with the shanks up, so that they could not be released with a snap chain, which made it necessary to pound them out. A peavy or cant hook was the instrument used for that purpose.

1. The evidence was sufficient to justify a finding that defendant had promised that the fid hooks should be adjusted by the loaders so that the shank would be down, and that, relying on such promise, Orcutt continued the work of unloading with a peavy. The usual and safest way to unload logs was with the snap chain, and this was the method employed by this company with occasional exceptions prior to 1909. During that season the exception became the custom, and the foreman complained to the superintendent, and requested that the hooks be fastened with the shanks down. The superintendent promised to report to the office, and have the office men write to the loading concern and see whether the change could be made. Later on word was received from the loading people that they were loading with a log jammer, and if the hooks were fastened with the shanks down they were likely to become unfastened while loading. This was reported to the foreman.

A month or so later, on July 15, Orcutt made a personal request to the foreman, in the presence of the superintendent, that the change be made, and the foreman said that he would write to Cass Lake and have the change made. The next load of logs came in on August 6, and Orcutt was assisting in unloading it when he was killed.

The fact that the logs were loaded by a third party under contract was immaterial, if defendant agreed to see that the change was made. The conversation just referred to amounted to a promise on the part of defendant, and was sufficient to justify Orcutt in continuing for a reasonable time to assist in unloading with the use of the peavy, unless the period of time elapsing between the time of the promise and the next shipment was so great that Orcutt was charged with notice that defendant did not intend to make the change. In the ordinary course of business it would seem ample time to bring about the change; but the record furnishes no reason for not doing so, except that the office received word that the hooks were likely to become detached in loading when hooked with the shank down. If this protest from the loaders was taken as final by the office, no notice to that effect appears to have been given to

Orcutt. On the morning of August 7, he was confronted with the same condition.

We are not prepared to hold that he should have concluded that defendant did not intend to comply with the promise. Had the shipments been continuous for those three weeks it might be strong evidence that no change was contemplated. It was in the summer time, and the shipments were spasmodic. Orcutt might have reasonably assumed that the change would be made as soon as the method of loading could be changed. This question was for the jury.

2. Did Orcutt assume the risk of using the peavy, notwithstanding the promise? Under this head defendant argues that the promise to change the method of fastening the hooks was indefinite, and that Orcutt could not have relied on it. The evidence was very clear that when the shanks of the fid hooks were down they could safely be snapped out with a chain. The hooks and chains were made to be handled in that way, and such was the method usually followed. That the use of the peavy was more dangerous goes without question, but it was to avoid the danger of using it that the men requested the change. The various requests were directed to the point of diminishing the danger by changing the method of fastening, and there can be no doubt that all the parties understood what was meant by the promise.

The conduct of Orcutt is not controlled by the rule applicable to an ordinary laborer with a common implement with which he is perfectly familiar, as in Webster v. Nisbett, 205 Ill. 273, 68 N. E. 936. He knew that it required skill to jump out of the way as soon as he struck the hook. The defect complained of was in placing the shanks up, but the risk consisted in getting out of the way after striking them with a peavy. One who continues in employment under a promise to repair a defect may recover, though he is aware of the risk to which he will be exposed. Greene v. Minneapolis & St. Louis Ry. Co., 31 Minn. 248, 17 N. W. 378, 47 Am. Rep. 785. It was a practice of the men to use the peavy when the hooks came with the shanks up, and defendant knew it. Orcutt was required, therefore, to exercise ordinary care while pursuing that

method after the promise was made. He assumed the risk connected with getting out of the way in time to avoid the logs; but, under the circumstances, it cannot be said that the risk was so imminent that an ordinarily prudent man would not have remained at the work.

3. Was deceased guilty of contributory negligence? It is true that the men charged with the duty of unloading the logs were not given directions in detail, but were left to the exercise of their judgment. Three methods of releasing the chains were followed by them, depending on the condition of the hooks and chain when the loads arrived. The evidence is to the effect that the eye bolts, which held the fid hook chains to the sill of the car, could be released by removing the burr; but this was generally resorted to only when the fid hooks were twisted, or in such position that they could not be removed with the snap chain or the peavy, or by readjusting the hooks. To remove the eye bolt it was necessary to get under the car and remove the burr, and then pry the bolt out. Another method sometimes resorted to was called readjusting the fid hooks. Each tier of logs was fastened with three chains, one close to each end and one in the middle. If the fid hooks on a load were so placed that no one of them could be snapped out, if one of the chains happened to be loose enough, the hook could be unhooked, and then rehooked with the shank down. If this chain would hold the logs, the other two hooks could then be driven out with a peavy, and then the readjusted hook could be snapped out.

The load which Orcutt was unloading was equipped with three chains, and the shanks of the hooks were all up; but it does not appear that either chain was loose enough to readjust. He first knocked out the hook at one end, then the one in the middle, and lastly the one at the other end. In so doing, he followed the usual method adopted by the men with defendant's knowledge. The peavy was only five and one-half feet long, and he stood as close to the end of the car and as far away as possible. He struck the hook once and jumped back, but it did not unhook. He then struck and jumped again; but the logs rolled at once, and he was caught on the shoulder by the end of one of them and knocked down, and the other logs caught him.

He was·charged with knowledge of the situation, and knew that the log which caught him projected about two feet beyond the others; but that was not an unusual condition, as the logs varied in length. Orcutt was an experienced employee, and understood the necessity of quick action; but no one had ever been caught before in that manner, and his failure to escape, by probably the fraction of a second, should not, under all the circumstances, condemn him as guilty of contributory negligence.

Affirmed.